COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Appellant,

v.

**Harold O. POSTMA, Appellee.**

**No. 88–695.**

Supreme Court of Iowa.

Oct. 19, 1988.

Rehearing Denied Nov. 18, 1988.

James E. Gritzner and Eric P. Sloter of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C., Des Moines, for appellant.

Charles L. Corbett of Corbett, Anderson, Corbett & Daniels, Sioux City, for appellee.

HARRIS, Justice.

This disciplinary proceeding against Postma, the respondent attorney, resulted from transactions in a business corporation in which he had a personal interest. The commission for the most part rejected the committee's charges but did recommend a reprimand. We granted the committee's request to appeal. Upon our de novo review we find serious breaches of professional ethics which demand a suspension.

It is of course incumbent upon the committee to establish the violation by clear and convincing evidence. *Committee on Professional Ethics & Conduct v. Piazza*, 405 N.W.2d 820, 821 (Iowa 1987). Some of the facts here and most of the inferences to be derived from them are hotly disputed. On our de novo review we are convinced of the following.

Postma became licensed in 1976 and has since been in general practice. A small portion of his practice, two to four percent, has been devoted to corporate matters. He served as county attorney from 1980 through 1982.

As county attorney Postma conducted an investigation into two Omaha businessmen who were operating what was thought to be a fraudulent insurance scheme. A key person in the investigation was Dave VanderWel who, with his father, invested and lost heavily in the scheme. Postma considered VanderWel to be a victim of the scheme and called him as a witness before the grand jury.

In the years which followed Postma performed legal services for VanderWel. Six separate matters were involved from 1981 through 1984. Although VanderWel found no occasion to seek legal services in 1985 or 1986 he continued to regard Postma as his attorney.

Postma also became professionally acquainted with Roger Lukken. Lukken was in charge of operations for Silak, Inc., a chemical packaging business at Alton, Iowa. From 1984 through early September 1985 Postma served as attorney for Silak. In March or April 1986 Lukken was discharged by Silak and he thereafter retained Postma to help prepare a small claims action for past wages. Silak counterclaimed and Postma appeared on behalf of Lukken.

After Lukken was discharged by Silak he was approached by Farnum Companies, an Arizona packaging customer of Silak. Farnum inquired where its products might be packaged. The inquiries sparked Lukken's interest in opening a new chemical packaging company and he promptly suggested to Postma that they undertake the business as co-owners.

Postma visited with VanderWel and interested him in joining the plan. Although VanderWel had no previous chemical packaging experience he came from a family with a strong financial reputation and, with his father, owned a building which could be used for the new business under a favorable lease.

It was agreed that Postma, Lukken, and VanderWel were to have equal ownership interests in the new company. Each of the three was also to have a specific responsi-

bility with the new company: Postma was to provide legal services; Lukken was to handle operations and production; Vander-Wel was to handle public relations and loan or grant applications. Lukken and Vander-Wel were to draw annual salaries of $20,-000 each and Postma was to be paid legal fees for corporate work.

Corporation papers were however not drawn according to plan. Postma drew all incorporation documents (the new company was called Consolidated Processing, Inc.) and they were completely silent of any control or even involvement by Postma or Lukken. Only VanderWel and his wife were identified as officers or shareholders. VanderWel was also named on the banking resolution with a local bank as treasurer and sole person with authority over corporate bank accounts.

Postma first confronted this inconsistency by suggesting a timeworn excuse. He said his secretary erred in following his instructions and he failed to note her mistake. On occasion this all too familiar explanation may be valid but it is one which experienced lawyers and judges view with unbounded skepticism, and never with admiration. In the present case it stretches credulity beyond the breaking point to suppose that Postma's secretary would inadvertently omit him and Lukken from equal ownership in the corporation.

As Postma's testimony developed at the hearing the explanation shifted but did not improve. He explained that he had been a controversial public figure as county attorney, did not wish to subject himself to publicity, and wished to remain anonymous. He believed it would be in the corporation's best interests if his and Lukken's interests were unknown. A much more plausible explanation for the so-called error is the one suggested by the committee: Postma was unwilling to document his involvement in a conflict of interests. We reject Postma's claim that his secretary made a "mistake" in the corporation documents. It is clear they were deliberately drawn to leave him anonymous although

the record does not reveal whether this was done for reasons suggested by the committee or those suggested by Postma.

There is also a factual dispute on whether Postma continued to represent the interests of VanderWel and Lukken (as well as his own) when he undertook to serve as attorney for the corporation. Postma insists he explained to both VanderWel and Lukken (during one preliminary conversation when the three were together) that he would be counsel only for the corporation and would not act to protect the interests of the three parties. VanderWel contradicted Postma's version, stating Postma never suggested he could not serve VanderWel in this matter as he had in others. We find Lukken's testimony on the question inconclusive. His recollection emphasized only Postma's statement that he would be counsel for the corporation; it was devoid of any clear statement Postma would not continue to represent the interests of VanderWel.

We conclude that, when the joint business venture was undertaken, Postma took no steps to notify VanderWel that their professional relationship was being discontinued and that VanderWel should seek other counsel. We find that VanderWel had every reason to, and did, consider Postma to be his personal attorney and that Postma was aware of VanderWel's belief.

After an auspicious beginning[1] Postma and Lukken found it in their interests to rid the corporation of VanderWel. Postma drafted a resignation and stock transfer for VanderWel's signature. VanderWel went to Postma's law office expecting to sign routine corporation documents and was instead presented with the papers which would have severed his connection with the corporation.

Thus confronted, VanderWel discussed the situation with Postma, including the possibility of accepting a cash amount for his interests. VanderWel did not sign but did make one or two additional trips to Postma's office to discuss the value of his interests.

---

1. From its formation September 30, 1986, until the end of that year the corporation showed sales of $138,420.21 and net income of $50,-687.76.

VanderWel thereafter obtained other counsel, Richard Zito, who, being presented with the corporation papers, noted they accorded VanderWel and his wife sole authority over all corporation affairs. Zito then undertook a strategy to exploit this authority. He wrote to Postma, notifying him that his position as corporation attorney was terminated and demanding surrender of corporation records and materials.

Postma did not respond to this notice. He reacted by causing corporation records to reflect that, three days later, Lukken was nominated as shareholder and elected to all corporation offices. No written notice of this meeting was prepared; the VanderWels received none and did not appear.[2]

The parties then began a struggle for control of $90,000 of corporate funds which were deposited in the Alton Savings Bank. Postma and Lukken opened an account in a Sioux City bank. It was closed by the bank when the bank learned an irregularity was involved. Another attempt to withdraw the funds from the Alton bank was thwarted by a bank officer who also noted the irregularities in the corporation records.

The following day an account was opened in a third bank but problems remained about getting access to the $90,000 still deposited in the Alton Savings Bank. To meet these problems Postma set up two more shareholders' meetings, this time with notice to the VanderWels.[3] On Zito's advice the VanderWels did not attend the meetings. Zito pointed out that only they had authority to call such a meeting and Zito feared their attendance might give it some semblance of validity.

Perhaps the most serious charge against Postma has to do with the manner in which he thereafter responded to Zito's strategy. It is scarcely necessary to point out that we are not concerned here with the merits of the controversy between Postma and VanderWel.[4] Our inquiry into Postma's professional conduct at this point focuses only on how Postma set about to prevail in that controversy.

Zito, on behalf of VanderWel, offered to enter into an arrangement for joint control of corporate funds. He had no wish to impede the progress of corporate business; indeed that would have not been in his client's interest. But this was not acceptable to Postma. On the basis of corporate minutes recorded in connection with the controverted meetings Postma tried unsuccessfully to persuade the Alton bank to transfer the funds. The bank indicated it would refuse to do so without a court order. Postma then brought an action in federal court to compel the transfer.[5] This action was dismissed by the federal court upon a finding it lacked jurisdiction.

Two days after the federal suit was dismissed Postma went to Judge Richard Branco of the Iowa district court with a document captioned "In re the Matter of the Checking and Savings Accounts of Consolidated Processing, Inc., at the Alton Savings Bank of Alton, Iowa." The document was entitled "Application for Order Pursuant to Section 524.808, 1987 Code of Iowa." The document in the form of pleading bore no reference to any pending legal action. Neither Zito nor the VanderWels were notified of the application or order.

Judge Branco was not advised that VanderWel was represented by counsel, nor was he advised that the matter was subject to controversy. Neither was the judge ad-

---

**2.** It appears this meeting violated the notice provisions in Iowa Code section 496A.28 (1987).

**3.** It appears the second meeting also did not have adequate notice to the VanderWels pursuant to Iowa Code section 496A.28. The third meeting may have had proper notice, however due to the potential problems with the first two meetings it is unclear what effect, if any, this meeting had on the corporation. We do not address these issues here.

**4.** Postma tries to justify his actions by claiming he was acting on the direction of the corporate president, Mr. Lukken, when in fact Postma knew that the corporate filings gave VanderWel total control over corporate activities. Postma was obviously acting to protect his and Lukken's interests and not acting on behalf of the corporation.

**5.** While action was pending in federal court the parties agreed that the funds could be used for company operation on the joint signatures of VanderWel and Lukken.

vised of the infirmities of the corporate proceedings. He was provided only with Postma's version of the conduct of Vander-Wel. On the basis of the presentation the judge signed an order which had been prepared by Postma. The order falsely indicated that VanderWel had been notified of the application by referring to notice of the third corporate meeting. It stated "the court, having reviewed the application together with the minutes of the 1987 annual meeting of the corporation board of directors, together with *proofs of service upon VanderWel,* and noting that Vander-Wel *failed to appear ...*" (Emphasis added.) The order was not filed in any Iowa district court.[6]

The following day Postma and Lukken presented the Alton bank officials with a copy of the court order. The original was still in Postma's possession. Based on the copy of the order the bank officials released the corporate funds to Postma and Lukken. They totaled more than $90,000.

The funds thus obtained were not segregated or separately maintained. About $87,000 was ultimately transferred to the account which Postma and Lukken had set up for the corporation. VanderWel did not discover the transfer until the following month when he checked the bank to determine the amount on deposit.

■ I. On several counts the ex parte presentation of the order to Judge Branco was a serious violation of professional ethics. Under DR 7–110(B), Code of Professional Responsibility, a lawyer shall not communicate orally with a judge concerning the merits of a controversy without adequate notice to the opposing party.

The violation was seriously aggravated in this case because of all the things Postma did not disclose to the judge. The judge was not told that VanderWel was represented by an attorney and that neither the attorney nor VanderWel were notified of the application. Indeed the form of the order strongly indicated the contrary. The judge was not told VanderWel's version of the controversy. Because these

matters were not disclosed the judge was deceived about the effect of the order he was persuaded to sign. This amounted to a misrepresentation of material facts by an attorney to a court. This is a gravely serious breach of professional ethics. *Committee on Professional Ethics and Conduct v. Davidson,* 398 N.W.2d 856, 857–60 (Iowa 1987); *Committee on Professional Ethics and Conduct v. Zimmerman,* 354 N.W.2d 235, 238 (Iowa 1984).

II. In the business venture Postma became involved in a hopeless conflict of interest. It is clear that a lawyer should not even enter a business transaction with a client if they have different interests and if the *client* expects the attorney to act professionally to protect the client (except with consent after full disclosure). DR 5–104(A).

■ The present case is a textbook example of why we have done our best to discourage business ventures between attorneys and their clients. The client is in a vulnerable position when the attorney's personal interests compete with the client's. In *Committee on Professional Ethics and Conduct v. Mershon,* 316 N.W. 2d 895, 899 (Iowa 1982), the facts were far less offensive than those appearing here because Merson was found to be forthright and honest and gained no personal profit from the transaction. We nevertheless found a violation of DR 5–104(A). We said:

> Respondent had three alternatives when the ... proposal was first made. The safest and perhaps best course would have been to refuse to participate personally in the transaction. *See* Annotated Code of Professional Responsibility 207 (American Bar Foundation ed. 1979). Alternatively, he could have recommended that [the client] obtain independent advice. Finally, if [the client] refused to seek independent advice or respondent did not recommend he do so, he could have made the least desirable choice. He could have attempted to meet the high

6. The commission found Postma's conduct relating to the preparation and presentation of this order merited a reprimand. It found no other misconduct.

standard of disclosure outlined in this opinion.

*Id.* at 899–900. Violation of the canon is established even when the client suffers no economic disadvantage. *Committee on Professional Ethics and Conduct v. Baker*, 269 N.W.2d 463, 466 (Iowa 1978). *See generally Committee on Professional Ethics and Conduct v. Oehler*, 350 N.W.2d 195, 198–99 (Iowa 1984); *Matter of Randall*, 640 F.2d 898, 905 (8th Cir.1981).

In defending against the conflict-of-interest charges Postma takes two stands. He (1) denies the existence of an attorney-client relationship and (2) points to the independent counsel later obtained by Vander-Wel. Neither of these defensive positions is valid. It must be remembered that Postma's personal interests were in conflict with his representation of the corporation.

Prior to the formation of the corporation Postma performed legal services for both VanderWel and Lukken and undertook to do so in the incorporating process. Neither VanderWel nor Lukken sought independent counsel at that time. The manner in which the corporation documents were improperly drawn demonstrates that Postma did not function as an independent attorney. At this time Postma, as a participant in the corporation, was clearly subject to the conflict of interest prohibitions of DR 5–101(A). *See* E.C. 5–18 (corporate lawyer's allegiance is owed to the corporation, not to any stockholder or officer).

In considering whether the attorney-client relationship existed between Postma and VanderWel it is important to remember that the canon, like all canons of professional ethics, was written in the public interest. Although Postma may have considered the professional relationship to be at an end, he did not so inform VanderWel. The canon is intended to protect persons, such as VanderWel, who regularly rely on an attorney for legal services which arise on an occasional and on-going basis. It is not a defense to a conflict of interest charge that the attorney was not on a permanent retainer or that no current matter was pending in the practice. It is enough that, because of a continuing professional relationship, the client had a reasonable right to assume the relationship continued. Because of the six matters during the preceding five years VanderWel was entitled to believe Postma was his lawyer.

VanderWel did not obtain independent counsel until after Postma had brought the dispute to a head. Even after VanderWel obtained separate counsel Postma insisted he was the attorney for the corporation. It can however be inferred from the record that Postma was acting to protect his own interests and not in the interests of the corporation in his subsequent conduct in the dispute.

We find that Postma violated the conflict of interest provisions of the Code of Professional Responsibility with regard to both his representation of VanderWel and his participation in the corporation.

III. Postma is also at fault for failing to file the order. When a lawyer has persuaded a judge to sign an order, the order becomes an official court document and it is an ethical violation for the lawyer not to promptly file the order with the clerk. *Committee on Professional Ethics and Conduct v. McGrevey*, 395 N.W.2d 894, 896 (Iowa 1986); *Committee on Professional Ethics and Conduct v. Hurd*, 325 N.W.2d 386, 390 (Iowa 1982).

IV. Postma's position is further weakened by his lack of candor. His version of controverted facts has been, in ways that we have explained, rejected in the foregoing findings. This is not his first such experience with us. We previously found his testimony less than forthright in personal litigation. *See Postma v. Sioux Center News*, 393 N.W.2d 314, 319 (Iowa 1986). It seems apparent that something stronger than a reprimand is required to impress upon him the importance of developing a forthright attitude. Our profession has no place for persons who demonstrate a penchant for distorting the truth.

We conclude that Postma's violations warrant an indefinite suspension of his license to practice law. This suspension shall be imposed with no possibility of reinstatement for six months from the filing of

this opinion. This suspension shall apply to all facets of the practice of law. Iowa S.Ct.R. 118.12. Any application for reinstatement shall be governed by Rule 118.-13.

Costs are taxed to Postma pursuant to Iowa supreme court rule 118.22.

LICENSE SUSPENDED.

All Justices concur except LARSON, SCHULTZ and CARTER, JJ., who concur specially.

SCHULTZ, Justice (specially concurring).

I do not agree with the determination by the majority that respondent violated ethical considerations by his dealings with a client. It was not established by clear and convincing evidence that David VanderWel was a client of respondent during the period in question.

The attorney and client relationship is contractual, *Healy v. Gray*, 184 Iowa 111, 115, 168 N.W. 222, 224 (1918), and terminates when the matter is concluded. *Orwig v. Chicago, Rock Island & Pacific Ry. Co.*, 217 Iowa 521, 528, 250 N.W. 148, 151 (1933). A client is defined as a person who employs or retains a lawyer to act for him or her in any legal business. Black's Law Dictionary (4th ed. 1968).

There is no evidence in the record that a contractual relationship existed between respondent and VanderWel at the creation or during the existence of the corporation. Postma was not handling any legal business for VanderWel nor was he retained by him. This is unlike the situations present in *Committee on Professional Ethics & Conduct v. Mershon*, 316 N.W.2d 895 (Iowa 1982) and *Committee on Professional Ethics & Conduct v. Baker*, 269 N.W.2d 463 (Iowa 1978). In these cases it was established that the lawyers were acting under a contractual relationship with their clients. I do not believe that this relationship can be created by previous employment plus the client's state of mind that a lawyer would represent him if he had a problem.

The evidence also does not show a fiduciary relationship existed between the two.

Respondent was not a confidential advisor to Vanderwel nor did he use knowledge or information gained through a professional relationship with VanderWel. *See Healy*, 184 Iowa at 118–19, 168 N.W. at 225. Rather, the legal business that respondent had handled for Vanderwel had been finished over two years before this transaction occurred and was completely alien to the new business.

Under these circumstances I cannot accept a determination that a conflict of interest existed. Nonetheless, I agree that Postma was otherwise guilty of ethical considerations as set out in the majority opinion and agree with the sanction.